**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00097-PAB-NYW

YOLANDA BEASLEY,
KIMBERLY SHEARS-BARNES,
SHENEEQUA CARRINGTON,
and JOLYNN FROST, and DAVID
ANDERSON, individually and on
behalf of all others similarly situated,

      Plaintiffs,

v.

TTEC SERVICES CORPORATION,

      Defendant.

_____

**CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**
_____

      Plaintiffs Yolanda Beasley, Kimberly Shears-Barnes, Sheneequa Carrington, Jolynn Frost, and David Anderson ("Plaintiffs") bring this Consolidated Class Action Complaint against TTEC Services Corporation ("TTEC" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

      1.    Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard sensitive information that Defendant's employees and clients entrusted to it, including, without limitation, names, dates of birth, healthcare ID numbers, clinical information including diagnoses, and/or Social Security numbers (collectively, "personally identifiable

information" or "PII"),[1] for failing to comply with industry standards to protect information systems that contain that PII, and for failing to provide timely, accurate, and adequate notice to Plaintiffs and other Class Members that their PII had been accessed and acquired by an unauthorized third party. Plaintiffs also allege that Defendant failed to provide timely, accurate, and adequate notice to Plaintiffs and Class Members of precisely what types of information was unencrypted and in the possession of unknown third parties. Plaintiffs seek, among other things, orders requiring Defendant to fully and accurately disclose the nature of the information that has been compromised, to adopt reasonably sufficient security practices and safeguards to prevent incidents like the disclosure in the future, to destroy information no longer necessary to retain for purposes for which the information was first obtained from Class Members, and to provide a sum of money sufficient to provide to Plaintiffs and Class Members identity theft protective services for their respective lifetimes as Plaintiffs and Class Members will be at an increased risk of identity theft due to the conduct of TTEC as described herein.

2.      Defendant TTEC is one of the largest global providers of customer experience technology and services.[2] According to Defendant's 2019 Investor Report, TTEC's annual revenue for 2019 was $1.644 billion.[3] TTEC provides customer care for some of the largest companies in the world, such as Bank of America, Best Buy, Credit Karma, Dish Network, Kaiser Permanente,

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).
[2] About Us, https://www.ttec.com/about-us/ (last visited Apr. 18, 2022).
[3] *TTEC 2019 Annual Investor Report*, https://investors.ttec.com/static-files/af618f43-f5de-40f4-a145-4e26b4a54551 (last visited Apr. 15, 2022).

USAA, and Verizon.[4]

3.      For its customers, TTEC leverages "next gen digital and cognitive technology" and delivers "digital customer engagement, customer acquisition & growth, content moderation, fraud prevention, and data annotation solutions."[5] TTEC's 62,000+ employees work to "bring technology and humanity together to deliver happy customers and differentiated business results."[6] In relation to these services, Defendant operates a network system that stores confidential, personal information about its employees and clients.

4.      In the ordinary course of their employment and/or interactions with Defendant, individuals such as Plaintiffs Beasley, Shears-Barnes are regularly required to provide their PII to Defendant. Similarly, individuals such as Plaintiff Frost are regularly required to provide their PII to clients who have retained Defendant to service their accounts.

5.      Defendant's document "*How TTEC Does Business: Our Ethics Code For Employees, Suppliers And Partners*" ("Ethics Code") is posted on its website.[7] Within the Ethics Code, TTEC states that employees have a "right to privacy" and that "[w]e safeguard our employees' information."[8]

6.      Additionally, Defendant has an Employee Privacy Policy posted on its website.[9] That Employee Privacy Policy states that TTEC expects employees and others "to protect the

---

[4] *Customer Care Giant TTEC Hit By Ransomware*, KREBSONSECURITY (Sept. 15, 2021) https://krebsonsecurity.com/2021/09/customer-care-giant-ttec-hit-by-ransomware/ (last visited Apr. 15, 2022).

[5] About Us, https://www.ttec.com/about-us/ (last visited Apr. 15, 2022).

[6] *Id.*

[7] Ex. 1 (Ethics Code), available at https://www.ttec.com/sites/default/files/how-ttec-does-business-our-ethics-code-for-employees-suppliers-and-partners.pdf (last visited Apr. 15, 2022).

[8] Ethics Code at 8.

[9] *See* Ex. 2 ("Privacy Policy"), *available at* https://www.ttec.com/privacy-policy (last visited December 15, 2021); *Employee Privacy Policy,* available at https://mybenefits.ttec.com/privacy-policy-2/ (last visited Apr. 15, 2022).

confidentiality of information about employees and our clients" and that employees must "prevent disclosure of private or proprietary information about employees or clients."[10]

7.      From March 31, 2021 to September 12, 2021, Defendant's internal administrative system was accessed by an unknown and unauthorized actor. On September 12, 2021, nearly six months after the initial intrusion, Defendant became aware of the unauthorized actor when that actor began encrypting Defendant's files via a ransomware attack (the "Data Breach").[11]

8.      During the Data Breach, this unauthorized third party accessed and obtained files stored on some of TTECs servers.[12]

9.      The unauthorized third party accessed and obtained files that contained the personal information of more than 102,858 individuals stored and maintained by Defendant.[13]

10.     On or about September 12, 2021, Defendant discovered the Data Breach when it "determined that certain devices in its network had been encrypted with ransomware."[14]

11.     On or about September 15, 2021, reports began surfacing online of widespread system outages at TTEC that began on September 12, 2021. On that date, the Defendant confirmed a ransomware attack to KrebsOnSecurity.[15]

12.     On or about December 8, 2021, nearly three months after discovering the Data Breach and detecting the ransomware attack, Defendant began notifying Plaintiffs and Class Members of the Data Breach.

---

[10] *Id.*
[11] Ex. 3 (sample *Notice of Data Breach* filed with Maine Attorney General).
[12] *See* Ex. 3.
[13] *See* TTEC's Maine Data Breach Notification, https://apps.web.maine.gov/online/aeviewer/ME/40/a49c129b-d8d5-4f09-beae-9135d8726541.shtml (last visited Apr. 15, 2022).
[14] Ex 3.
[15] *Customer Care Giant TTEC Hit By Ransomware*, KREBSONSECURITY (Sept. 15, 2021) https://krebsonsecurity.com/2021/09/customer-care-giant-ttec-hit-by-ransomware/ (last visited Apr. 15, 2022).

13.     This case involves a breach of a computer system by an unknown third party, resulting in the unauthorized acquisition of the PII of Plaintiffs and Class Members to unknown third parties. As a result of Defendant's failure to implement and follow basic security procedures, PII of Plaintiffs and Class Members was exfiltrated and is in the hands of criminals. Plaintiffs and Class Members now and will forever face a substantial increased risk of identity theft. Consequently, Plaintiffs and Class Members have had to spend, and will continue to spend, significant time and money in the future to protect themselves due to TTEC's failures.

14.     Additionally, as a result of Defendant's failure to follow contractually agreed upon, federally-prescribed, industry standard security procedures, Plaintiffs and Class Members received only a diminished value of the services Defendant was to provide.

15.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access, intrusion, and/or acquisition.

16.     Defendant admits that "an unauthorized actor obtained" unencrypted files that contained PII, including names and Social Security numbers.

17.     The exposed PII of Plaintiffs and Class Members can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiffs and Class Members now face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers and names.

18.     This PII was accessed and acquired by an unauthorized third party due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiffs and Class Members. In addition to Defendant's failure to prevent the Data Breach, Defendant failed to detect the unauthorized activity on its servers for over six months. Defendant also purposefully maintained secret the specific vulnerabilities and root causes of the breach and

5

has not informed Plaintiffs and Class Members of that information. Furthermore, Plaintiffs and Class Members remain unaware of precisely what information was unencrypted and now in the possession of unknown third parties.

19.     As a result of this delayed response, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

20.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

## II. PARTIES

21.     Plaintiff Yolanda Beasley is a Citizen of Arkansas, residing in Little Rock, Arkansas.

22.     Plaintiff Kimberly Shears-Barnes is a Citizen of Arkansas, residing in Cabot, Arkansas.

23.     Plaintiff Sheneequa Carrington is a Citizen of Virginia, residing in Berryville, Virginia.

24.     Plaintiff Jolynn Frost is a Citizen of Arizona residing in Tucson, Arizona.

25.     Plaintiff David Anderson is a Citizen of Kentucky, residing in Cadiz, Kentucky.

26.     Defendant TTEC Services Corporation is a for-profit corporation incorporated in the state of Colorado, headquartered at 9197 South Peoria Street, Englewood, Colorado 80112,

with its principal place of business in Englewood, Colorado.[16]

27.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff.  Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

28.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III.  JURISDICTION AND VENUE

29.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

30.     The District of Colorado has personal jurisdiction over the Defendant named in this action because Defendant is headquartered in this District and Defendant conducts substantial business in Colorado and this District through its headquarters, offices, parents, and affiliates.

31.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.  FACTUAL ALLEGATIONS

***Background***

32.     Defendant is "one of the largest" customer experience technology and services

---

[16] About Us, https://www.ttec.com/about-us/ (last visited Apr. 15, 2022).

providers.[17] According to Defendant's 2019 Investor Report, TTEC's annual revenue for 2019 was $1.644 billion.[18] TTEC provides customer care for some of the largest companies in the world, such as Bank of America, Best Buy, Credit Karma, Dish Network, Kaiser Permanente, USAA and Verizon.[19]

33.   For its customers, TTEC utilizes "next gen digital and cognitive technology" and delivers "digital customer engagement, customer acquisition & growth, content moderation, fraud prevention, and data annotation solutions."[20] TTEC's 62,000+ employees work, mostly remotely from their homes, to "bring technology and humanity together to deliver happy customers and differentiated business results."[21] In relation to these services, Defendant operates a network system that stores confidential, personal information about its employees and customers.

34.   Defendant's website has a posted "Privacy Policy" ("Privacy Policy") that explains how Defendant collects and uses the personal data of applicants for employment, clients and business contacts, including visitors to TTEC's websites.[22] Within that Privacy Policy, Defendant states that TTEC is "committed to maintaining your privacy while providing you services."[23]

35.   Defendant also has an Employee Privacy Policy posted on its website.[24] The Employee Privacy Policy States:

> TTEC expects employees and others (such as independent contractors and alliance partners) **to protect the confidentiality of**

---

[17] About Us, https://www.ttec.com/about-us/ (last visited Apr. 15, 2022).
[18] *TTEC 2019 Annual Investor Report*, https://investors.ttec.com/static-files/af618f43-f5de-40f4-a145-4e26b4a54551 (last visited December 15, 2021).
[19] *Customer Care Giant TTEC Hit By Ransomware*, KREBSONSECURITY (Sept. 15, 2021) https://krebsonsecurity.com/2021/09/customer-care-giant-ttec-hit-by-ransomware/ (last visited December 15, 2021).
[20] About Us, https://www.ttec.com/about-us/ (last visited Apr. 15, 2022).
[21] *Id.*
[22] Privacy Policy, *available at* https://www.ttec.com/privacy-policy (last visited Apr. 15, 2022).
[23] *Id.*
[24] Employee Privacy Policy, https://mybenefits.ttec.com/privacy-policy-2/ (last visited Apr. 15, 2022).

**information about employees and our clients**. This information may include, among other information, personnel files, contract records, and operations information. As a result, employees and others must: **(1) prevent disclosure of private or proprietary information about employees or clients**; (2) apply, where necessary, the appropriate protective measures required by the laws or regulations of those countries in which TTEC operates; and (3) support privacy requirements placed on TTEC in client contracts. If you have any questions about the applicability of any privacy law or requirement to information that you have, please contact the appropriate compliance contact.[25]

36.     Within the Ethics Code, TTEC claims "[w]e safeguard our employees' information" and that Defendant's employees have a "right to privacy."[26]

37.     The Ethics Code further states:

As part of your employment, TTEC has access to your personal identifying information (home address and contact details, family, compensation, health and disabilities information, results of your background check, employment history and other sensitive information). We store and use this information and sometimes (with consent when required) transfer it to others, but only for business purposes. **We are committed to respecting your privacy and to using best practices to safeguard this information.**

If, as part of your job, you have access to employees' private data, you must observe all restrictions for data access, take precautions to protect the data from misuse, and only access it on a need-to-know basis for legitimate business purposes. It is also our responsibility to never discuss or share (via email or otherwise) an employee's private data with other employees or third parties unless such persons have a 'need to know' and we have obtained approval from our immediate supervisor.[27]

38.     The Ethics Code also states:

While serving our clients and their customers, we have access to sensitive and confidential information. We protect this information diligently and expect it not to leave our secure environment. Never transfer confidential information outside the TTEC Global Network, including to your personal email address, or to non-company devices or storage locations. If you become aware of potential mishandling or 'leakage' of confidential information, we

---

[25] *Id.*
[26] Ethics Code at 8.
[27] *Id.* (emphasis added).

9

expect you to report the situation immediately.[28]

39.     Plaintiffs and Class Members are Defendant's employees and individuals who provided their PII to Defendant's clients who retained Defendant to service their accounts. As a condition of these relationships, Plaintiffs and Class Members were required to provide sensitive and confidential information to Defendant.

40.     In the ordinary course of their employment relationships with Defendant, individuals such as Plaintiffs are regularly required to provide their PII to Defendant. In the ordinary course of their business relationships with Defendant, clients regularly provide individuals', such as Plaintiffs', PII to Defendant for account servicing. This information includes but is not limited to: name and Social Security number, home address and contact details, family, compensation, health and disabilities information, background check results, employment history and other sensitive information.[29]

41.     Plaintiffs and the Class Members entrusted this sensitive and confidential information to Defendant to store and manage. As explained above, this information included, without limitation, names and Social Security numbers, many of which are static, do not change, and can be used to commit myriad financial crimes.

42.     Defendant has not yet made Plaintiffs and Class Members aware of the extent to which the above referenced personal information was accessed or exfiltrated during the six-month period of the Data Breach.

43.     Plaintiffs and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand

---

[28] Ethics Code at 10.

[29] *See id.*

10

security to safeguard their PII.

44.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties.

### The Data Breach

45.     From March 31, 2021[30] to September 12, 2021, Defendant's internal administrative system was accessed by an unknown, unauthorized actor via a ransomware attack (the "Data Breach").[31]

46.     During the Data Breach, this unauthorized third party accessed and obtained files stored on some of TTECs servers.[32]

47.     The unauthorized third party exfiltrated files that contained the personal information of more than 102,858 individuals stored and maintained by Defendant.[33]

48.     For almost six months, the unauthorized third party had access to files and information on the Defendant's network, allegedly operating undetected.

49.     Before or on September 12, 2021, Defendant discovered the Data Breach when it "determined that certain devices in its network had been encrypted with ransomware."[34]

50.     On or around September 15, 2021, reports began surfacing online of widespread system outages at TTEC that began on September 12, 2021. The reports stated that a ransomware attack had been performed by the "Ragnar Locker" ransomware group, or another group imitating

---

[30] TTEC informed some Class Members that the Data Breach began on March 4, 2021 but informed the public and the states Attorneys General that the Data Breach began on March 31, 2021.

[31] Ex. 3 (sample *Notice of Data Breach* filed with Maine Attorney General); Ex. 4 (sample *Notice of Data Breach* filed with Montana Attorney General).

[32] *See* Ex. 3.

[33] *See* TTEC's Maine Data Breach Notification, https://apps.web.maine.gov/online/aeviewer/ME/40/a49c129b-d8d5-4f09-beae-9135d8726541.shtml (last visited Apr. 15, 2022).

[34] Ex 3.

the name.

51.     According to KrebsOnSecurity, internal messages sent to certain employees suggested the company's network may have been hit by the ransomware group "Ragnar Locker."[35] The messages urged employees to avoid clicking on a file that suddenly may have appeared in their Windows start menu called "!RA!G!N!A!R!_AE947DF6_$" or something similar.[36]



As shown above, the notice read, "DO NOT click on this file. It's a nuisance message file and we're working on removing it from our systems."[37]

52.     On or around September 15, 2021, Defendant responded to reports of a ransomware attack with a statement that read:

> TTEC is committed to cyber security, and to protecting the integrity of our clients' systems and data. We recently became aware of a cybersecurity incident that has affected certain TTEC systems. Although as a result of the incident, some of our data was encrypted and business activities at several facilities have been temporarily disrupted, the company continuous to serve its global clients. TTEC immediately activated its information security incident response business continuity protocols, isolated the systems involved, and took other appropriate measures to contain the incident. We are now in the process of carefully and deliberately restoring the systems that

---

[35] *Customer Care Giant TTEC Hit By Ransomware*, KREBSONSECURITY (Sept. 15, 2021) https://krebsonsecurity.com/2021/09/customer-care-giant-ttec-hit-by-ransomware/ (last visited Apr. 15, 2022).
[36] *Id.*
[37] *Id.*

12

have been involved.

We also launched an investigation, typical under the circumstances, to determine the potential impacts.  In serving our clients TTEC, generally, does not maintain our clients' data, and the investigation to date has not identified compromise to clients' data. That investigation is on-going and we will take additional action, as appropriate, based on the investigation's results. This is all the information we have to share until our investigation is complete.[38]

53.     On September 17, 2021, Defendant released a statement confirming a cyberattack that contained no mention of any exfiltrated or encrypted data nor any mention of ransomware.[39] The statement quoted Ken Tuchman, TTEC Chairman and CEO, who stated "[in] just five days our team moved aggressively to rebuild and further solidify our processes and infrastructure. TTEC continues to prioritize our client and people-facing processes and systems."[40] It further stated "[t]he company has worked through the initial recovery measures, hardened its cyber security, is in the process of completing its investigation, and assessing the business impact of the incident."

54.     On or about December 8, 2021, Defendant sent Plaintiffs and Class Members a Notice of Data Incident.[41]  Defendant informed Plaintiffs and Class Members that:

**TTEC understands the importance of protecting the information we hold, and the security of your information is a priority for us.**

As TTEC previously disclosed, the company detected and addressed a cyber security incident in September 2021. In connection with the incident, a thorough investigation was performed, and we recently learned that the incident involved some of your information. This notice explains the incident, outlines the measures TTEC has taken in response, and provides some additional steps you can take to protect your information.

As soon as TTEC learned about the cyber security incident, we

---

[38] *Id.*
[39] *TTEC Resolves Cyber Incident* (Sept. 17, 2021), https://www.ttec.com/newsroom/press-release/ttec-resolves-cyber-incident (last visited Apr. 15, 2022).
[40] *Id.*
[41] Ex. 3.

immediately began an investigation, and cyber security firms that have assisted other organizations with similar matters were engaged. We also notified law enforcement and have been supporting their investigation.

We learned that there was unauthorized activity in our network between March 31, 2021 and September 12, 2021. During that time, an unauthorized actor obtained files stored on some of our servers. We completed a careful review of those files and other files on the servers on November 24, 2021 and determined that one or more of the files contained your <<Variable Data>>.[42]

55.    On or about December 15, 2021, Plaintiff Frost received Defendant's Notice of Data Incident, dated December 15, 2021.[43] The notice, which was printed on TTEC letterhead, stated, in part, as follows:

Wellcare By Allwell received a notice from our vendor, TTEC Healthcare Solutions, Inc. ("TTEC"), that it had a cyber incident. This incident involved your information. As a precaution, this letter provides steps you can lake to help protect your information. We take the privacy and security of your information very seriously. We sincerely regret any concern may cause you.

**Why Does TTEC Have My Information**

Wellcare By Allwell used TTEC to call members and support our operations.

**What Happened**

On Oct. 27, 2021, TTEC informed Wellcare By Allwell that some of our member information was involved in a cyber incident. TTEC had the incident between **March 4, 2021 and Sept. 12, 2021**. During that time, an unauthorized actor viewed or downloaded our data files stored on TTEC's systems. Upon learning of the cyber incident. TTEC instantly took measures to contain the incident. They began an investigation. They engaged cyber security firms with experience in these matters. Law enforcement was notified, and TTEC worked to support its investigation.

---

[42] Ex. 3 at 2. Upon Plaintiffs' information and belief, <<Variable Data >> represents a field for the type(s) of information exfiltrated.
[43] *Id.*

The forensic investigation is now complete. Your information was included in the data files involved in this incident.

**What Information Was Involved**

Your information involved in this incident included your name and one or more of the following types of information:
- Date of Birth
- Healthcare ID Number
- Clinical Information Including Diagnosis[44]

56.     On or around December 8, 2021, Defendant reported the Data Breach by notifying the Maine State Attorney General, Montana State Attorney General, and other Attorneys General now unknown to Plaintiff, of the Data Breach. Defendant also provided the Maine and Montana Attorneys General with a "sample" notice of the Data Breach.[5]

57.     Defendant admitted in the reports to the Attorneys General, and the "sample" notice of the Data Breach that an unknown, unauthorized third party accessed and obtained Defendant's files. Defendant also admitted that the unauthorized third party exfiltrated files containing sensitive information about current or former employees and/or clients of Defendant, including, at the very least, names, dates of birth, healthcare ID numbers, medical histories, and Social Security numbers.

58.     Defendant claims that upon detecting the unauthorized third party, the Defendant "immediately began an investigation, and cyber security firms that have assisted other organizations with similar matters were engaged."[45] However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the adequacy of any remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiffs and Class Members, who retain a vested interest in ensuring that their information remains protected.

59.     The unencrypted PII of Plaintiffs and Class Members may end up for sale on the

---

[44] *Id.* (emphasis added) At this time, Plaintiff is unaware as to why the dates of the Data Breach provided within this letter differ from the dates provided to the public and other Class Members.
[45] Ex. 3.

dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members.  Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

60.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it maintained and stored belonging Plaintiffs and Class Members, causing the exposure and theft of PII for more than 102,858 individuals.

61.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[46]

62.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no

---

[46] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.justice.gov/criminal-ccips/file/872771/download  (last visited Apr. 15, 2022).

users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[47]

63.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & InfrastructureSecurity Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches.Vulnerable applications and OSs are the target of most ransomwareattacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well asthose you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different

_____

[47] *Id.* at 3-4.

domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[48]

64.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-            Apply latest security updates
-            Use threat and vulnerability management
-            Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-            Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

---

[48] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Apr. 18, 2022).

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[49]

65.    Given that Defendant was storing the PII of more than 102,858 individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

### *Defendant Acquires, Collects, and Stores the PII of Plaintiffs and Class Members.*

66.    Defendant acquired, collected, and stored the PII of Plaintiffs and Class Members.

67.    As a condition of employment with Defendant, individuals entrusted Defendant with highly confidential PII.

68.    To enable Defendant to service their customer's accounts, Defendant's business clients – such as Wellcare by Allwell – entrusted Defendant with their customer's PII.

---

[49] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-    ransomware-attacks-a-preventable-disaster/ (last visited Apr. 18, 2022).

69.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

70.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and implicitly relied on Defendant to keep their PII confidentialand securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *Securing PII and Preventing Breaches*

71.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data, especially outdated information.

72.     Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

73.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

74.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[50] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number,employer

---

[50] 17 C.F.R. § 248.201 (2013).

or taxpayer identification number."[12]

75.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### Value of Personal Identifiable Information

76.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[51] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[52] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[53]

77.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your

---

[51] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Apr. 15, 2022).

[52] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017,   *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Apr. 15, 2022).

[53] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Apr. 15, 2022).

number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[16]

78.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

79.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[54]

80.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name and Social Security number.

81.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the

---

[54] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Apr. 15, 2022).

black market."[55]

82.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

83.    The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

84.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[56]

85.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

86.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will

---

[55] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Apr. 15, 2022).
[56] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Apr. 15, 2022).

continue to incur such damages in addition to any fraudulent useof their PII.

87.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's file servers, amounting to potentially tens or hundreds of thousands of individuals' detailed, personal information and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

88.     To date, Defendant has offered Plaintiffs and Class Members only twelve months of credit monitoring and identity protection services through IDX. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

89.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

90.     ***Defendant's Conduct Violates HIPAA***

91.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

92.     Defendant's Data Breach resulted from a combination of insufficiencies that indicate Defendant failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Defendant's Data Breach that Defendant either failed to implement, or inadequately implemented, information security policies or procedures in place to protect Plaintiff and Class Members' PII and PHI.

93.     In addition, Defendant's Data Breach could have been prevented if Defendant

implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PII and PHI when it was no longer necessary and/or had honored its obligations to its patients.

94.     Defendant's security failures also include, but are not limited to:

    a.  Failing to maintain an adequate data security system to prevent data loss;

    b.  Failing to mitigate the risks of a data breach and loss of data;

    c.  Failing to ensure the confidentiality and integrity of electronic protected health information Defendant creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

    d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

    e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

    f.  Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii);

    g.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2);

    h.  Failing to protect against any reasonably-anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR 164.306(a)(3);

    i.   Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 CFR 164.306(a)(94);

    j.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, *et seq.*; and

    k.   Retaining information past a recognized purpose and not deleting it.

95.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[57]

96.    Because Defendant has failed to comply with industry standards, while monetary relief may cure some of Plaintiff and Class Members' injuries, injunctive relief is necessary to ensure Defendant's approach to information security is adequate and appropriate. Defendant still maintains the protected health information and other PII of Plaintiff and Class Members; and without the supervision of the Court via injunctive relief, Plaintiff and Class Members' protected health information and other PII remains at risk of subsequent Data Breaches.

### *TTEC Failed to Comply with FTC Guidelines*

97.    Defendant was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799

---

[57] Breach Notification Rule, U.S. Dep't of Health & Human Services, *available at*: hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Apr. 13, 2022).

F.3d 236 (3d Cir. 2015).

98.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[58]

99.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[59] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

100.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[60]

101.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[58] Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Apr. 18, 2022).

[59] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Apr. 18, 2022).

[60] FTC, *Start With Security*, *supra*.

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

102.   Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employee PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

103.   Defendant was at all times fully aware of its obligation to protect the PII of its employees because of its status as a customer experience vendor that offers fraud protection and data annotation services. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### Plaintiff Yolanda Beasley's Experience

104.   During the years 2014 and 2017, Plaintiff Beasley was employed by TTEC.  During that time, she worked remotely from her home in Arkansas.  As a condition of that relationship, Plaintiff Beasley was required to provide and entrust her PII, including her name and Social Security number, to Defendant.[61]

105.   At the time of the Data Breach (March 31, 2021 to September 12, 2021), Defendant retained, among other personal information, the names and Social Security numbers of Plaintiff Beasley and other individuals in its internal, administrative system.

106.   Plaintiff Beasley received Defendant's Notice of Data Incident, dated December 8, 2021, on or about that date. The notice stated that Plaintiff Beasley's name and Social Security number were contained in files obtained during the Data Breach. The letter appeared in

---

[61] Ex. 4 (Plaintiff Beasley's *Notice of Data Breach* Letter).

substantially the same form as the sample notice submitted to the Attorney General of Maine.

107.    As a result of the Data Breach notice, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Incident and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

108.    Additionally, Plaintiff is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

109.    Plaintiff stores any documents containing her sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

110.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII —a form of intangible property that Plaintiff entrusted Defendant for the purpose of employment, which was compromised in and as a result of the Data Breach.

111.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy. Plaintiff has also noted an uptick in the number and frequency of phishing attempts and spam phone calls, emails, and text messages since the Data Breach.

112.    Plaintiff has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number in combination with her name, being placed in the hands of unauthorized third parties and possibly criminals.

113.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff Kimberly Shears-Barnes' Experience*

114.    From approximately December 2014 to September 2016, Plaintiff Shears-Barnes was employed by TTEC, for whom she worked remotely from her home in Arkansas. Additionally, she worked for TTEC intermittently on and off since 2017. As a condition of that relationship, Plaintiff Shears-Barnes was required to provide and entrust her PII to Defendant, including her name and Social Security number.

115.    At the time of the Data Breach (March 31, 2021 to September 12, 2021), Defendant retained, among other personal information, the names and Social Security numbers of Plaintiff Shears-Barnes and other individuals in its internal, administrative system.

116.    Plaintiff received Defendant's Notice of Data Incident, dated December 8, 2021, on or about that date.[62] The notice stated that Plaintiff Shears-Barnes' name and Social Security number were contained in files obtained during the Data Breach. The letter appeared in substantially the same form as the sample notice submitted to the Attorney General of Maine.

117.    As a result of the Data Breach notice, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Incident and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

118.    Additionally, Plaintiff is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

119.    Plaintiff stores any documents containing her sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

---

[62] Ex. 5 (Plaintiff Shears-Barnes's *Notice of Data Breach Letter*).

120.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII —a form of intangible property that Plaintiff entrusted Defendant for the purpose of employment, which was compromised in and as a result of the Data Breach.

121.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy. Plaintiff has also noted an uptick in the number and frequency of phishing attempts and spam phone calls, emails, and text messages since the Data Breach.

122.     Plaintiff has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number in combination with her name, being placed in the hands of unauthorized third parties and possibly criminals.

123.     Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

124.     Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Sheneequa Carrington's Experience*

125.     From approximately 2015 to 2016, Plaintiff Carrington was employed by TTEC, for whom she worked remotely from her home in Virginia. As a condition of that relationship, Plaintiff Carrington was required to provide and entrust her PII to Defendant, including her name and Social Security number.

126.     At the time of the Data Breach (March 31, 2021 to September 12, 2021), Defendant retained, among other personal information, the names and Social Security numbers of

Plaintiff Carrington and other individuals in its internal, administrative system.

127.    Plaintiff received Defendant's Notice of Data Incident, dated December 8, 2021, on or about that date. The notice stated that Plaintiff Carrington's name and Social Security number were contained in files obtained during the Data Breach. The letter appeared in substantially the same form as the sample notice submitted to the Attorney General of Maine.

128.    As a result of the Data Breach notice, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Incident and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

129.    During the Data Breach, Plaintiff received "countless" notifications that her Social Security number had been found on the dark web from the credit monitoring service supplied by her credit card provider.

130.    Additionally, Plaintiff is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

131.    Plaintiff stores any documents containing her sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

132.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII —a form of intangible property that Plaintiff entrusted Defendant for the purpose of employment, which was compromised in and as a result of the Data Breach.

133.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy. Plaintiff has also noted an uptick in the number and frequency of phishing attempts and spam phone calls, emails, and text messages since the Data Breach.

134.    Plaintiff has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number in combination with her name, being placed in the hands of unauthorized third parties and possibly criminals.

135.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Jolynn Frost's Experience

136.    Plaintiff has been receiving insurance coverage from Wellcare by Allwell ("Allwell") for approximately five (5) years. As a condition of that relationship, Plaintiff was required to provide and entrust her PII to Defendant, including her name and Social Security number, as well as her health insurance information and medical history.

137.    TTEC Healthcare Solutions ("TTEC") is a vendor for Allwell.[63] Allwell used TTEC to "call members and support our operations."[64]

138.    As a condition of that relationship, Plaintiff Frost was required to provide and entrust her PII, including, but not limited to: her name, date of birth, medical history, and Social Security number to Defendant - either to Defendant directly or through Allwell.

139.    At the time of the Data Breach, Defendant retained, among other personal information, the name, date of birth, healthcare ID number, and clinical information, including diagnosis information, about Plaintiff Frost and other individuals in its internal, administrative system.

140.    Plaintiff Frost received Defendant's Notice of Data Incident, dated December 15,

---

[63] Ex. 6 (Plaintiff Frost's *Notice of Data Breach* Letter).
[64] *Id.*

2021, on or about that date.[65]

141.    As a result of the Data Breach notice, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Incident and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

142.    Additionally, Plaintiff is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

143.    Plaintiff stores any documents containing her sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

144.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII —a form of intangible property that Plaintiff entrusted Defendant for the purpose of employment, which was compromised in and as a result of the Data Breach.

145.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy. Plaintiff has also noted an uptick in the number and frequency of phishing attempts and spam phone calls, emails, and text messages since the Data Breach.

146.    Plaintiff has suffered injury arising from the present and continuing risk of fraud, identity theft, and misuse resulting from her PII, especially her date of birth in combination with her name and medical history, being placed in the hands of unauthorized third parties and possibly criminals.

147.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information

---

[65] *Id.*

and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff David Anderson's Experience*

148.    Prior to the Data Breach Plaintiff Anderson filled out an application for employment at TTEC. In the course of seeking employment with TTEC and as a condition of employment, he was required to supply TTEC with his PII, including but not limited to his name and Social Security number.

149.    Plaintiff Anderson received the Notice of Data Breach from Defendant in December of 2021.

150.    Following the Data Breach, Plaintiff Anderson received a notification from a credit monitoring service that notified him his PII was found on the Dark Web.

151.    As a result of the Data Breach, Plaintiff Anderson has experienced an increase in the number of spam phone calls, emails and texts since the Data Breach, which appear to be placed with the intent of obtaining personal information to commit identity theft by way of a social engineering attack.

152.    Accordingly, as a result of the Data Breach, and pursuant to Defendant's own instructions set forth in the Notice of Data Breach, Plaintiff Anderson was required to spend time monitoring his credit history and financial accounts for suspicious activity.

153.    In response to the Notice of Data Breach, Plaintiff Anderson spent time dealing with the consequences of the Data Breach, which included and will include time spent verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

154.    Plaintiff Anderson is very careful about sharing PII and has never knowingly

transmitted unencrypted PII over the internet or any other unsecured source.

155.    Plaintiff Anderson stores any and all documents containing PII in a safe and secure location and shreds any documents he receives in the mail that contain any PII, or that may contain any information that could otherwise be used to compromise his credit card accounts and identity. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

156.    Plaintiff Anderson suffered actual injury and damages as a result of the Data Breach. Implied in his employment application with TTEC was the requirement that it adequately safeguard his PII. Plaintiff would not have applied for employment with TTEC had TTEC disclosed that it lacked data security practices adequate to safeguard PII.

157.    Plaintiff Anderson suffered actual injury in the form of damages and diminution in the value of his PII—a form of intangible property that she entrusted to TTEC for the purpose of employment, which was compromised by the Data Breach.

158.    Plaintiff Anderson has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in TTEC's possession, is protected and safeguarded from future breaches.

## V.  CLASS ALLEGATIONS

159.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

160.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **All United States residents whose PII was compromised in the Data Breach first detected by TTEC Services Corporation on or before September 12, 2021 (the "Nationwide Class").**

161.    Excluded from the Nationwide Class are the following individuals and/or entities:

Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff members.

162.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

163.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1):  The Nationwide Class (the "Class") are so numerous that joinder of all members is impracticable. Defendant has identified more than one hundred thousand individuals whose PII was improperly accessed and acquired in the Data Breach, and the Class is apparently identifiable within Defendant's records. Defendant advised the Maine Attorney General that the breach affected 102,858 individuals.

164.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include, without limitation:

    a.  Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

    b.  Whether Defendant had duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

    c.  Whether Defendant had duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

    d.  Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

e.  Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members;

k.  Whether Defendant retained PII beyond the time required by regulations or beyond what is necessary for business purposes;

l.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

165.   Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Members of the Class were injured through the common misconduct of Defendant.

Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

166.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

167.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

168.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class

action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

169.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

170.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

171.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

172.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

40

173.     Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

174.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b.   Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, andsafeguarding their PII;

c.   Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.   Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.   Whether Defendant breached the implied contract;

f.   Whether an express contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that express contract;

g.   Whether Defendant breached the express contract;

h.   Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

i.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information

compromised in the Data Breach;

    j.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members; and,

    k.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## <u>COUNT I</u>
## NEGLIGENCE
### (On Behalf of Plaintiffs and the Nationwide Class)

175.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

176.    As a condition of their employment with Defendant, Plaintiffs and the Nationwide Class were obligated to provide their personally identifiable information to Defendant. Alternatively, as a condition of receiving services from Defendant's clients, Defendant's clients entrusted Defendant with the PII of Plaintiffs and the Nationwide Class.

177.    Plaintiffs and the Nationwide Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

178.    Defendant has full knowledge that the PII belonging to Plaintiffs and the Nationwide Class contained personal and sensitive information that is valuable to identity thieves and other criminals. Defendant also knew of the serious harms and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII were wrongfully disclosed, that disclosure was not fixed, or Plaintiffs and the Class were not told about the disclosure in a timely manner.

179.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Nationwide Class involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class, even if the harm occurred

through the criminal acts of a third party.

180. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiffs and the Nationwide Class in Defendant's possession was adequately secured and protected.

181. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former employee's PII it was no longer required to retain pursuant to regulations.

182. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Nationwide Class.

183. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Nationwide Class. That special relationship arose because Plaintiffs and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of their employment with Defendant or as a condition to receiving contracted services from Defendant's business clients.

184. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Nationwide Class.

185. Defendant had a common law duty to prevent foreseeable harm to those whose PII it stored. This duty existed because Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices.

186. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

187. Plaintiffs and Nationwide Class were the foreseeable and probable victims of any

inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems. In fact, not only was it foreseeable that Plaintiffs and the Nationwide Class Members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, TTEC knew or should have known that it was more likely than not Plaintiffs and other Nationwide Class Members would be harmed.

188.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiffs and the Nationwide Class, including basic encryption techniques freely available to Defendant.

189.    Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

190.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Data Breach.

191.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Nationwide Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Nationwide Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

192.    Defendant has admitted that the PII of Plaintiffs and the Nationwide Class was wrongfully disclosed to and obtained by unauthorized third persons as a result of the Data Breach.

193.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Nationwide Class during the time the PII was within Defendant's possession or control.

194.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

195.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and the Nationwide Class in the face of increased risk of theft.

196.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and the Nationwide Class's PII.

197.    Defendant's failure to comply with industry and federal regulations further evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Nationwide Class's PII.

198.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Nationwide Class the existence and scope of the Data Breach.

199.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the PII of Plaintiffs and the Nationwide Class would not have been compromised.

200.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Nationwide Class and the harm, or risk of imminent

45

harm, suffered by Plaintiffs and the Nationwide Class. The PII of Plaintiffs and the Nationwide Class was accessed and/or lost as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

201.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII and PHI is used; (iii) the compromise, publication, and/or theft of their PII and PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII and PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII and PHI, which remain in Defendant's possession and are subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII and PHI of Plaintiff and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Nationwide Class.

202.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

203.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class are entitled to and demand actual, consequential, and nominal damages.

204.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT II
### *NEGLIGENCE PER SE*
**(On Behalf of Plaintiffs and the Nationwide Class)**

205.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

206.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

207.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

208.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

209.    Plaintiffs and the Nationwide Class are within the class of persons that the FTC Act was intended to protect.

210.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses,

47

which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Nationwide Class.

211.   Defendant's violation of HIPAA also independently constitutes negligence *per se*.

212.   HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

213.   Plaintiffs and Class Members are within the class of persons that HIPAA privacy laws were intended to protect.

214.   The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

215.   Defendant's conduct also violated Colo. Rev. Stat. § 6-1-713.5. Colo. Rev. Stat. § 6-1-713.5 requires commercial entities who maintain, own, or license "personal identifying information of an individual residing in the state" to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal identifying information and the nature and size of the business and its operations."

216.   Defendant failed to comply with Colo. Rev. Stat. § 6-1-713.5. Specifically, Defendant voluntarily undertook the act of maintaining and storing Plaintiff's PII but Defendant failed to implement safety and security procedures and practices sufficient enough to protect from the data breach that it should have anticipated. Defendant should have known and anticipated that data breaches—especially health data—were on the rise, and that medical institutions were lucrative or likely targets of cybercriminals looking to steal PII. Correspondingly, Defendant should have

implemented and maintained procedures and practices appropriate to the nature and scope of information compromised in the data breach.

217.    Plaintiffs and Class Members are within the class of persons that Colo. Rev. Stat. § 6-1-713.5 was intended to protect.

218.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

219.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that they were failing to meet their duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their PII.

220.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT III
### *BREACH OF IMPLIED CONTRACT*
### (On Behalf of Plaintiffs and the Nationwide Class)

221.    As a condition of obtaining employment from Defendant and/or services from business clients of Defendant, Plaintiffs and the Nationwide Class were obligated to provide their personally identifiable information to Defendant.

222.    In so doing, Plaintiffs and the Nationwide Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Nationwide Class if their data had been breached and compromised or stolen.

223.    Plaintiffs and the Nationwide Class fully performed their obligations under the

49

implied contracts with Defendant.

224.     Plaintiffs and the Nationwide Class entered into the implied contracts with the reasonable expectation that Defendant's data and cyber security practices and policies were reasonable and consistent with industry standards. Plaintiffs and the Nationwide Class believed that Defendant would use part of the monies paid to Defendant through Defendant's customers to fund adequate and reasonable data and cyber security practices, as Defendant represented it would in its Ethics Code.

225.     Plaintiffs and the Nationwide Class would not have provided and entrusted their sensitive and confidential information to Defendant in the absence of the implied contract or implied terms between them and Defendant. The safeguarding of the PII of Plaintiffs and the Nationwide Class was critical to realize the intent of the parties.

226.     Defendant breached the implied contracts it made with Plaintiffs and the Nationwide Class by failing to safeguard and protect their personal information and by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

227.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Nationwide Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

228.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT IV
## BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiffs and the Nationwide Class)

229.     Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

230.     Defendant and the Nationwide Class entered into contracts for employment and/or services, among other things. As a condition of that relationship, Plaintiffs and the Nationwide Class entrusted personal and sensitive information to Defendant, which gave rise to a duty to safeguard that information.

231.    These contracts included, in part, promises to provide services for "data security." For example, Defendant's Employee Privacy Policy expressly states TTEC's promise that its employees will "protect the confidentiality of information about employees and our clients" and "prevent disclosure of private or proprietary information about employees or clients."[66]

232.   Defendant's Ethics Code makes similar promises.[67] Within the Ethics Code, TTEC promises to "safeguard our employees' information" and that Defendant's employees have a "right to privacy."[68]

233.   The Ethics Code further states:

> As part of your employment, TTEC has access to your personal identifying information (home address and contact details, family, compensation, health and disabilities information, results of your background check, employment history and other sensitive

---

[66] *Id.*
[67] Ex. 1 (Ethics Code) at 8.
[68] *Id.*

information). **We store and use this information and sometimes (with consent when required) transfer it to others, but only for business purposes. We are committed to respecting your privacy and to using best practices to safeguard this information.** [69]

234.    Thus, in contracting for employment and/or services, Defendant promised to safeguard the PII of Plaintiffs and the Nationwide Class.

235.    Defendant's contracts with its employees, among other things, promised to take reasonable measures to safeguard and protect such information for the benefit of Plaintiffs and the Nationwide Class.

236.    Plaintiffs and the Nationwide Class would not have entrusted such sensitive personal and medical information to Defendant, directly or indirectly, in the absence of Defendant's promise to adequately safeguard the data.

237.    Defendant breached the contracts it entered into by failing to provide reasonable data security measures.

238.    As a direct and proximate result of Defendant's above-described breach of contract with its employees, Plaintiffs and the Nationwide Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

239.    As a direct and proximate result of Defendant's above-described breach of contract,

---

[69] *Id.*

Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT V**
**BREACH OF CONTRACT:**
**THIRD PARTY BENEFICIARY**
**(On Behalf of Plaintiffs and the Nationwide Class)**

240.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

241.     As a condition of receiving services from Defendant's clients, Plaintiffs and the Nationwide Class entrusted personal and medical information to Defendant's clients, which gave rise to a duty to safeguard that information.

242.    Defendant and Defendant's clients contracted for the provision of customer relation services, among other things.

243.    These contracts included, in part, promises to provide services for "data security." Defendant represents that, "[w]hile serving our clients and their customers, we have access to sensitive and confidential information. We protect this information diligently and expect it not to leave our secure environment."[70]

244.    Thus, in contracting for data security services, Defendant promised to discharge Defendant's customers' duties to safeguard the personal and medical information of Plaintiff and the Nationwide Class.

245.    Defendant's contracts with clients, among other things, promised to take reasonable measures to safeguard and protect such information for the benefit of Plaintiffs and the Nationwide Class.

246.     Similarly, when Defendant's clients provided the Plaintiffs' and the Nationwide

---

[70] Ex. 1.

Class's personal and medical information to Defendant, Plaintiffs and the Nationwide Class were the intended third party beneficiaries of Defendant's promise to safeguard the data.

247.    Defendant's clients, Plaintiffs, and the Nationwide Class would not have entrusted such personal and medical information to Defendant, directly or indirectly, in the absence of Defendant's promise to adequately safeguard the data.

248.    Defendant breached the contracts it entered into by failing to provide reasonable data security measures.

249.    As a direct and proximate result of Defendant's above-described breach of contract with its customers, Plaintiffs and the Nationwide Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

250.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT VI
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Nationwide Class)

251.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

252.    Plaintiffs and the Nationwide Class had a legitimate expectation of privacy to their

PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

253.    Defendant owed a duty to those individuals whose PII Defendant collected and stored as a condition of employment, including that of Plaintiffs and the Nationwide Class, to keep their PII obtained as a condition thereof, confidential.

254.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and the Nationwide Class.

255.    Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiffs and the Nationwide Class, by way of Defendant's failure to protect the PII.

256.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Nationwide Class is highly offensive to a reasonable person.

257.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and the Nationwide Class disclosed their PII to Defendant as a condition of their employment, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and the Nationwide Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

258.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiffs' and the Nationwide Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

259.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it acted with actual knowledge that its information security practices were inadequate

and insufficient.

260.    Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Nationwide Class.

261.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiffs and the Nationwide Class was disclosed to third parties without authorization, causing Plaintiffs and the Nationwide Class to suffer damages.

262.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Nationwide Class in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and the Nationwide Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Nationwide Class.

263.    As a direct and proximate result of Defendant's invasion of privacy, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT VII**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs and the Nationwide Class)**

264.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

265.    At all times during Plaintiffs' and the Nationwide Class's interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and the Nationwide Class's PII that Plaintiffs and the Nationwide Class provided to Defendant.

266.    As alleged herein and above, Defendant's relationship with Plaintiffs and the Nationwide Class was governed by terms and expectations that Plaintiffs' and the Nationwide

Class's PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

267.    Plaintiffs and the Nationwide Class provided Plaintiffs' and the Nationwide Class's PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

268.    Plaintiffs and the Nationwide Class also provided their PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect that PII from unauthorized disclosure.

269.    Defendant voluntarily received in confidence Plaintiffs' and the Nationwide Class's PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

270.    Due to Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and the Nationwide Class's PII was disclosed to and misappropriated by unauthorized third parties beyond Plaintiffs' and the Nationwide Class's confidence, and without their express permission.

271.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and the Nationwide Class have suffered damages.

272.    But for Defendant's disclosure of Plaintiffs' and the Nationwide Class's PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and/or used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and the Nationwide Class's PII as well as the resulting damages.

273.    The injury and harm Plaintiffs and the Nationwide Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and the Nationwide Class's

PII. Defendant knew or should have known its methods of accepting and securing Plaintiffs' and the Nationwide Class's PII was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and the Nationwide Class's PII.

274.    As a direct and proximate result of Defendant's breach of its confidence with Plaintiffs and the Nationwide Class, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect that PII; and (viii) present and future costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

275.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses. As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT VIII**
**Violation of Colorado Consumer Protection Act,**
**Colo. Rev. Stat. § 6-1-101, *et seq.***
**(On behalf of Plaintiffs and the Nationwide Class)**

276.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

277.    Plaintiffs allege this Count solely in the alternative to Plaintiffs' breach of contract claims.

278.    Plaintiffs and Class Members conferred a monetary benefit on Defendant by providing Defendant with their PII.

279.    Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiffs and Class Members and accepted that monetary benefit.

280.    However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

281.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures.

282.   Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

283.   If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

284.   Plaintiffs and Class Members have no adequate remedy at law.

285.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

286.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

**COUNT IX**
**Violation of Colorado Consumer Protection Act,**
**Colo. Rev. Stat. § 6-1-101, *et seq*.**
**(On behalf of Plaintiffs and the Nationwide Class)**

287.    The Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1)(l), *et seq.*, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service.

288.    TTEC is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101, *et seq.*

289.    Plaintiffs and the Nationwide Class are current and former TTEC employees who, for employment purposes, provided sensitive and confidential PII to TTEC, which TTEC collected, stored, and maintained at its Colorado headquarters.

290.    Defendant is engaged in, and its acts and omissions affect, trade and commerce. Defendant's relevant acts, practices and omissions complained of in this action were done in the course of TTEC's business of marketing, offering for sale, and selling goods and services throughout the United States.

291.    In the conduct of its business, trade, and commerce, and in the sale of customer relation services to consumers, Defendant engaged in the conduct alleged in this Complaint in transactions intended to result, and which did result, in the sale of services to consumers. Plaintiffs and other members of the Nationwide Class furnished or purchased these services. Plaintiffs and the Nationwide Class are actual or potential consumers as defined by Colo. Rev. Stat § 6-1-113(1), *et seq.*

292.    In the conduct of its business, trade, and commerce, and in the sale of customer relation services to consumers, Defendant collected and stored highly personal and private information, including PII belonging to Plaintiffs and the Nationwide Class.

293.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiffs and the Nationwide Class and that the risk

of a data breach was highly likely and/or that the risk of the data breach being more extensive than originally disclosed was highly likely.

294.   Defendant should have disclosed this information regarding its computer systems and data security practices because Defendant was in a superior position to know the true facts related to the defect, and Plaintiffs and the Nationwide Class could not reasonably be expected to learn or discover the true facts.

295.   As alleged herein this Complaint, Defendant engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and the furnishing of customer relation services to consumers in violation of the Colorado Consumer Protection Act, including but not limited to the following:

    a.   failing to adequately secure employee names and Social Security numbers;

    b.   failing to maintain adequate computer systems and data security practices to safeguard employees and potential customer's personal and financial information;

    c.   failing to disclose the material information, known at the time of the transaction – collection and retention of the employee PII to furnish customer relation services – that its computer systems would not adequately protect and safeguard employee PII;

    d.   inducing consumers to use Defendant's services by failing to disclose, and misrepresenting the material fact that Defendant's computer systems and data security practices were inadequate to safeguard employee's and client's sensitive personal information from theft.

296.   By engaging in the conduct delineated above, Defendant has violated the Colorado Consumer Protection Act by, among other things:

    a.   omitting material facts regarding the goods and services sold;

b.  omitting material facts regarding the security of the transactions between Defendant and its customers;

c.  omitting material facts regarding the security of the transactions between Defendant and its employees who furnished customer relations services;

d.  misrepresenting material facts in the furnishing or sale of products, goods or services to consumers;

e.  engaging in conduct that is likely to mislead consumers acting reasonably under the circumstances;

f.  engaging in conduct which creates a likelihood of confusion or of misunderstanding;

g.  engaging in conduct with the intent to induce consumers to use Defendant's services;

h.  unfair practices that caused or were likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers; and/or

i.  other unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices to be shown at trial.

297.    Defendant systemically engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiffs and the Nationwide Class.

298.    Defendant's actions in engaging in the conduct delineated above were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Nationwide Class.

299.    As a direct result of Defendant's violation of the Colorado Consumer Protection Act, Plaintiffs and the Nationwide Class have suffered actual damages, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention,

detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect that PII; and (viii) present and future costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

300.    As a result of Defendant's violations of the Colorado Consumer Protection Act, Plaintiffs and the Nationwide Class are entitled to, and seek, injunctive relief, including but not limited to:

a.   Ordering that Defendant engage third-party security auditors/penetration testers as well as experienced and qualified internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering that Defendant engage third-party security auditors and experienced and qualified internal security personnel to run automated security monitoring;

c.  Ordering that Defendant audit, test, and train its security personnel regarding new or modified procedures;

   d.  Ordering that Defendant's segment data by, among other things, creating firewalls and access controls so that if one area of Defendant is compromised, hackers cannot gain access to other portions of Defendant's systems;

   e.  Ordering that Defendant purge, delete, and destroy in a reasonably secure manner employee and customer data not necessary for its provision of services;

   f.  Ordering that Defendant conduct regular database scanning and securing checks;

   g.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and,

   h.  Ordering Defendant to meaningfully educate its employees and customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps customers must take to protect themselves.

301.   As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices of Defendant alleged herein, Plaintiffs and putative class members seek relief under Colo. Rev. Stat. § 6-1-113, including, but not limited to, the greater of actual damages, statutory damages, or treble damages for bad faith conduct, injunctive relief, and attorneys' fees and costs, as allowable by law.

### COUNT X
**Violation of the Arizona Consumer Fraud Act,**
**Ariz. Rev. Stat. § 44-1521, *et seq*.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

302.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

303.   Defendant sold Plaintiffs and the Nationwide Class "merchandise" as that term as defined by A.R.S. § 44-1521, in the form of services, including health and insurance services, as

well as the provision of other customer care services.

304.    Section 44-1522 of the Arizona Consumer Fraud Act provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

*See* A.R.S. § 44-1522(A).

305.    Defendant used deception, used a deceptive act or practice, and fraudulently omitted and concealed material facts in connection with the sale or advertisement of that merchandise in violation of A.R.S. §44-1522(A).

306.    Defendant omitted and concealed material facts, which it knew about and had the duty to disclose—namely, Defendant's inadequate privacy and security protections for Plaintiffs' and the Nationwide Class's PII. Defendant omitted and concealed those material facts even though in equity and good conscience they should have been disclosed and did so with the intent that others would rely on the omission, suppression, and concealment.

307.    The concealed facts are material in that they are logically related to the transactions at issue and rationally significant to the parties in view of the nature and circumstances of those transactions.

308.    Plaintiffs do not allege any claims based on any affirmative misrepresentations by Defendant; rather Plaintiffs allege that Defendant omitted, failed to disclose and concealed material facts and information as alleged herein, despite its duty to do so.

309.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiffs' and the Nationwide Class's PII, and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in these deceptive acts

and practices were negligent, knowing and willful, and wanton and reckless with respect to the rights of Plaintiffs and the Nationwide Class.

310.    Plaintiffs and the Nationwide Class were ignorant of the truth and the concealed facts and incurred damages as a consequent and proximate result.

311.    Plaintiffs and the Nationwide Class seek all available relief under A.R.S. § 44-1521, *et. seq.*, including, but not limited to, compensatory damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## <u>COUNT XI</u>
### **Violation of Virginia's Personal Information Breach Notification Act**
### **Va. Code. Ann. §§ 18.2-186.6, *et seq.***
### **(On Behalf of Plaintiffs and the Nationwide Class)**

312.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 178.

313.    Defendant is required to accurately notify Plaintiffs and the Nationwide Class following discovery or notification of a breach of their data security system if unencrypted or unredacted PII was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identity theft or another fraud, without reasonable delay under Va. Code Ann. § 18.2-186.6(B).

314.    Defendant is an entity that maintains computerized data that includes PII as defined by Va. Code Ann. §§ 18.2-186.6(B), (D).

315.    Plaintiffs and the Nationwide Class's PII includes personal information as covered under Va. Code Ann. § 18.2-186.6(A).

316.    Because Defendant discovered a breach of its security system in which unencrypted or unredacted PII was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identity theft or other

67

fraud, Defendant had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Va. Code Ann. §§ 18.2-186.6(B), (D).

317.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Va. Code Ann. §§ 18.2-186.6(B), (D).

318.    As a direct and proximate result of Defendant's violations of Va. Code Ann. §§ 18.2-186.6(B), (D), Plaintiffs and the Nationwide Class suffered damages as described above.

319.    Plaintiffs and the Nationwide Class seek relief under Va. Code Ann. § 18.2-186.6(I), including actual damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Nationwide Class, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class and appointing Plaintiffs and their Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and the Nationwide Class, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and the Nationwide Class;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Nationwide Class, including but not limited to an order:

  i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

 ii.    requiring Defendant to protect, including through encryption, all data

collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and the Nationwide Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and the Nationwide Class;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and the Nationwide Class;

v. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vi. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

viii. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and the Nationwide Class;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals

must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programssufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For  an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demands that this matter be tried before a jury.

Date: April 18, 2022                           Respectfully Submitted,


*/s/ Francesca Kester*
Francesca Kester
Jean S. Martin
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com
fkester@ForThePeople.com

Kevin Hannon, Esq.
CO Bar No. 501825

71

**MORGAN & MORGAN**
1641 Downing Street
Denver, CO 80128
303-861-8800
khannon@forthepeople.com

Elaine A. Ryan
CO Bar No. 42989
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
520-705-7332
eryan@auer-ryan.com

Gary M. Klinger
**Milberg Coleman Bryson Phillips Grossman, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: 866.252.0878
E: gklinger@milberg.com

*Attorneys for Plaintiffs and the Proposed Class*